UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
____

CORDALL NEAL,

        Plaintiff,                        Case No. 1:23-cv-895

v.                                            Honorable Robert J. Jonker

UNKNOWN PELKEY,

        Defendant.
_____/

**OPINION**

       This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. The Court previously granted Plaintiff leave to proceed *in forma pauperis*. (ECF No. 7.) The Court also stayed further proceedings to permit mediation. (*Id.*) Plaintiff sought exclusion from the mediation program, (ECF No. 8), and the Court removed the case from the program, (ECF No. 10.) Accordingly, the Court will enter an order lifting the mediation stay and authorizing collection of the filing fee.

       Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiff's claims under the Fifth and Fourteenth Amendments

for failure to state a claim. The Court will also dismiss Plaintiff's claims against Defendant Pelkey in his official capacity for failure to state a claim for monetary damages on grounds of immunity and failure to state a claim for declaratory relief within the limits of *Ex Parte Young*, 209 U.S. 123, 159–60 (1908). Plaintiff's First Amendment retaliation claims against Defendant Pelkey in his personal capacity will remain in the case.

## Discussion

Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC) at the Macomb Correctional Facility (MRF) in New Haven, Macomb County, Michigan. The events about which he complains, however, occurred at the Oaks Correctional Facility (ECF) in Manistee, Manistee County, Michigan. Plaintiff sues ECF Resident Unit Manager Unknown Pelkey in his official and personal capacities. (Compl., ECF No. 1, PageID.2.)

Plaintiff transferred in to ECF on January 5, 2023. (*Id.*, PageID.12.) After he transferred in, he asked Defendant Pelkey to authorize Plaintiff's purchase of a footlocker to hold Plaintiff's "excess legal property." (*Id.*, PageID.7.) Plaintiff informed Defendant Pelkey that years before a hearing officer in a prior facility had conducted a hearing and determined that Plaintiff had excess legal property. (*Id.*) Plaintiff attaches the paperwork from the Thumb Correctional Facility. That paperwork includes a "Notice of Intent to Conduct an Administrative Hearing" dated May 3, 2019. (ECF No. 1-3, PageID.45.) The notice indicates that Corrections Officer Ream determined that Plaintiff had an "excess foot locker with excess pro[pe]rty that is legal work inside." (*Id.*) Plaintiff requested a hearing on the matter. (*Id.*)

Plaintiff also attaches the Administrative Hearing Report. (*Id.*, PageID.44.) According to the report, hearing officer Szappan inventoried the property and concluded it was all allowable legal property. (*Id.*) The report says nothing about a footlocker nor does it mention how Plaintiff would be allowed to store the property. But, presumably, because the notice of intent was prompted

by the presence of an "excess foot locker" with "excess pro[pe]rty," Plaintiff was in possession of an excess footlocker at that time.

Plaintiff provides a copy of the MDOC policy regarding personal property: Policy Directive 04.07.112. (ECF No. 1-2, PageID.17–42.) The attached policy directive was made effective April 26, 2021, and it superseded a prior policy directive that had an effective date of September 1, 2019. (*Id*., PageID.17.) Thus, even the policy directive that preceded the attachment was not the policy directive in place when Plaintiff's legal property survived the hearing at the Thumb Correctional Facility in May of 2019. Moreover, the attachment is not the policy directive that is in place now, although it is the policy directive that was in place when Plaintiff filed his complaint. *See* https://www.michigan.gov/corrections/public-information/statistics-and-reports/policy-directives (select "04.07.112 Prisoner Personal Property") (last visited Nov. 20, 2023). The policy directive provisions that are significant to Plaintiff's claim, however, appear to be consistent in all material respects.

The Personal Property policy directive allows prisoners to possess "legal property." MDOC Policy Directive 04.07.112 ¶ O (eff. Apr. 26. 2021), (ECF No. 1-2, PageID.20). The policy directive defines legal property. *Id*. The definition is tied, in part, to the pendency of legal proceedings. *Id*. Thus, legal property that is permissible at one point in time might not be permissible later.

> There are limits to the amount of personal property that a prisoner may possess:
>
> Excessive prisoner property in housing units constitutes a fire hazard and creates sanitation, housekeeping, and security concerns. A prisoner in Level I or II shall not at any time have property that exceeds that which can be contained in one state-issued duffel bag or similarly sized container(s) authorized by the CFA Deputy Director and one footlocker if purchased by the prisoner. A prisoner in Level IV or V shall not have property that exceeds that which can be contained in one state-issued duffel bag or similarly sized container(s) authorized by the CFA Deputy Director or, in Level IV, one footlocker if purchased by the prisoner. These limits

3

> apply to all of the prisoner's personal property, whether in their cell or stored elsewhere in the facility, except typewriters, musical instruments legitimately purchased prior to October 27, 2015 that cannot physically be contained inside a state-issued duffle bag or footlocker, excess allowable legal property, and medically necessary items authorized to be possessed by the prisoner pursuant to PD 04.06.155 "Offenders With Disabilities," PD 04.06.160 "Medical Details and Special Accommodation Notices" or PD 04.06.165 "Optometric Services." These limits also apply to clothing items issued to the prisoner pursuant to PD 04.07.110 "State-Issued Items and Cell/Room Furnishings," except for special clothing items issued to wear on a work assignment.

*Id.* ¶ C. If a prisoner's property exceeds the limits stated above because of legal property, the prisoner is entitled to a hearing to determine if the items that are pushing him over the limit are legal property. *Id.* ¶ P. If it is determined that a prisoner has allowable excess legal property, that property must be stored in footlockers designated for that purpose, to be purchased at the prisoner's expense. *Id.*

When Plaintiff asked Pelkey to authorize the purchase of a footlocker for Plaintiff's excess legal property shortly after Plaintiff arrived at ECF, Pelkey declined. (Compl., ECF No. 1, PageID.7.) Pelkey informed Plaintiff that his nearly four-year-old determination of excess legal property did not entitle him to an excess legal property footlocker without following the steps necessary to determine whether Plaintiff had excess legal property. (*Id.*)

Plaintiff insisted that Pelkey was wrong. His entire complaint is premised on the fact that his nearly four-year-old determination of excess legal property entitled him to purchase a footlocker whenever he wanted to—for all time. That assertion, however, is belied by the policies he attaches to his complaint. Whether or not a prisoner is entitled to possess particular items of legal property depends in significant part on whether the legal matter remains pending:

> Legal property is defined as follows:
>
> 1. Pleadings and other documents ordinarily filed with a court, research notes, exhibits, law books, legal periodicals, and similar written documents and items that are necessary for litigation that the prisoner is currently pursuing on their own behalf, subject to PD 05 .03. 118 "Prisoner Mail." This does not include law books

4

and legal periodicals to which the prisoner has access through the institutional law library. Unless otherwise specifically permitted in this paragraph, this does not include material belonging to another prisoner. Examples of authorized material include the following:

> a. Any lawsuit that has been filed by the prisoner but has not been finally disposed of by a court.
>
> b. Any lawsuit that the prisoner is preparing for filing.
>
> c. Documents and correspondence pertaining to the prisoner's pending grievances and misconducts, including pending misconduct administrative appeals.
>
> d. Documents and correspondence pertaining to any pending lawsuit certified as a class action, if the prisoner is a member of the class.
>
> e. Documents and correspondence pertaining to divorce and support, child visitation, and child custody matters; these are considered pending litigation if the prisoner has minor children even if a judgment has been entered.

2. Pleadings, transcripts, court orders, and court opinions arising out of the criminal case or which the prisoner is currently serving, even if there is no pending litigation.

MDOC Policy Directive 04.07.112 ¶ O (eff. Apr. 26, 2021), (ECF No. 1-2, PageID.20.) Accordingly, whether particular items are permitted legal property will necessarily change over time.

Plaintiff entirely ignored this limit of the MDOC policy when he discussed the matter with Defendant Pelkey on January 10, 2023. Indeed, Plaintiff contended that the policy required Pelkey to approve the purchase of a new footlocker. Plaintiff demanded that Pelkey show Plaintiff where the policy requires updated hearings. Pelkey then told Plaintiff to step away. Plaintiff threatened to grieve Defendant Pelkey because, Plaintiff insisted, he was "allowed to order a legal footlocker and this[—Pelkey's refusal to comply—] was harassment." (Compl., ECF No. 1, PageID.8.) Pelkey told Plaintiff that Pelkey did not care about Plaintiff's threatened grievance because nothing

would come of it and that Pelkey would never authorize the purchase of an excess legal property footlocker because of Plaintiff's smart mouth.

On January 14, 2023, Plaintiff wrote a letter to Warden Burgess explaining that Pelkey denied Plaintiff the right to order a legal footlocker. (*Id*.) Plaintiff attached the letter to his complaint. (ECF No. 1-4, PageID.47.) In the letter he states that he already had a hearing, and that he had already been approved to have and purchase a legal footlocker. (*Id*.) Based on the documents Plaintiff has provided, however, that is not the case. According to the 2019 Notice of Intent, Plaintiff already possessed a footlocker for his excess legal property. Neither his allegations nor his documents support the representation that the officials at TCF approved his purchase of an additional footlocker beyond the one he already had. Plaintiff asked Burgess to either allow Plaintiff to purchase a legal footlocker or have someone conduct another hearing. (*Id*.)

Two weeks later, Plaintiff encountered Warden Burgess in Plaintiff's unit after "count." (Compl., ECF No. 1, PageID.8.) Plaintiff spoke to the warden in Defendant Pelkey's presence. (*Id*.) Plaintiff described to the warden his contact with Pelkey regarding the footlocker. Burgess asked if Plaintiff had excess legal property, if Plaintiff was still fighting his case, and if Plaintiff had counsel.[1] After Plaintiff responded "yes" to each question, Burgess photographed Plaintiff ID card, told Plaintiff to fill out a disbursement order, and "assured Plaintiff all would be good." (*Id*.)

---

[1] Plaintiff is presently serving a consecutive string of sentences imposed following his convictions of first-degree premeditated murder and use of a firearm during the commission of a felony by a Lenawee County Circuit Court jury during 2002. *See* MDOC Offender Tracking Information System, https://mdocweb.state.mi.us/otis2/otis2profile.aspx?mdocNumber=236735 (last visited Nov. 20, 2023). Plaintiff's claim that he was, at that time, pressing a continuing challenge to his convictions is belied by the publicly available Michigan appellate court dockets. Plaintiff has pressed several challenges to his convictions all the way through the Michigan Supreme Court, but it does not appear that any were pending when he made the representations to Warden Burgess. *See* https://www.courts.michigan.gov/case-search/ (search "Cordall Neal") (last visited Nov. 20, 2023); *People v. Neal*, 980 N.W.2d 699 (Mich. 2022); *People v. Neal*, 946 N.W.2d 271 (Mich. 2020); *People v. Neal*, 943 N.W.2d 136 (Mich. 2020); *Neal v. Ionia Corr. Fac. Warden*, 915

Plaintiff sent Burgess another letter to confirm those details. Plaintiff attached the letter to his complaint. (ECF No. 1-5, PageID.49.) He asked that the warden personally see to it that Plaintiff's disbursement request "get processed" and also asked for the loan of a container, footlocker, or "green state bag" to store his excess legal property pending the arrival of his legal footlocker. (*Id.*)

It appears that Plaintiff's conversation and/or his follow-up correspondence had the desired effect. On February 6, 2023, Defendant Pelkey told Plaintiff to pack up all of his property in a state green duffle bag and leave it in his cell so Defendant could examine it. (Compl., ECF No. 1, PageID.8–9.) A corrections officer gave Plaintiff a duffle bag for that purpose. Pelkey did not come to Plaintiff's cell that day. (*Id.*, PageID.8.) That prompted Plaintiff to write Defendant a letter that evening. (ECF No. 1-6, PageID.51.)

In the letter, Plaintiff reported to Defendant Pelkey that Warden Burgess had instructed Plaintiff to order the footlocker. Moreover, because Plaintiff had asked Burgess for the loan of a container, footlocker, or bag to store his excel legal property, Plaintiff interpreted the bag that he received as the response to that request. Plaintiff closed by asking whether the disbursement had been submitted and processed. (*Id.*)

Defendant Pelkey called Plaintiff to his office the next day and again asked Plaintiff to pack up all of his property in the state green duffle bag. (Compl., ECF No. 1, PageID.9.) Plaintiff

---

N.W.2d 476 (Mich. 2018); *People v. Neal*, 856 N.W.2d 40 (Mich. 2014); *People v. Neal*, 723 N.W.2d 886 (Mich. 2006); *People v. Neal*, 702 N.W.2d 583 (Mich. 2005); *People v. Neal*, 697 N.W.2d 153 (Mich. 2005). It is noteworthy that Plaintiff does not actually allege that he was still pursuing challenges to his criminal case at the time; he alleges only that he told Warden Burgess that Plaintiff was still fighting his case. (Compl., ECF No. 1, PageID.9.) It is also noteworthy that it does not matter whether Plaintiff was still fighting his case at that time, because a prisoner may possess legal property relating to his own criminal case whether or not litigation is pending. (ECF No. 1-2, PageID.20, ¶ O.)

7

complied. He alleges that after packing everything he had in one full duffle bag and one full "personal" footlocker, but he still had excess legal property a foot high that covered over half his mattress.

Plaintiff returned to Defendant's office and informed him the property was packed. Plaintiff reports that Defendant advised Plaintiff he would examine the property after Plaintiff returned from lunch.

When Plaintiff returned from lunch he stopped at Defendant's office. The door was shut. According to Plaintiff:

> then defendant gazed at plaintiff infuriatingly and spewed verbal insults at plaintiff, willfully and with evil intent proclaiming: "I will teach your ass what happens when you threaten me with writing a grievance on me don't you see my door is shut". He then ignored plaintiff and proceeded to work on his computer, as plaintiff stood there left personally humiliated and embarrassed.

(*Id.*, PageID.9–10.) In response, Plaintiff warned Defendant that Plaintiff was not going to tolerate any more insults and harassment and that he intended to write a grievance against Defendant. (*Id.*, PageID.10.)

Thereafter, Defendant Pelkey accompanied Plaintiff to the cell and examined the property. Pelkey accused Plaintiff of playing games and bemoaned Plaintiff going over Defendant's head and talking to the warden. Pelkey cautioned Plaintiff that going over Pelkey's head would accomplish nothing because his superiors were of the same mind as Pelkey. Pelkey warned Plaintiff that if he kept "this up" he would end up in the hole. (*Id.*) That evening, Plaintiff received the disbursement through the mail. (*Id.*) Defendant had not authorized the disbursement because "Prisoner did not have excess property . . . ." (*Id.*, PageID.11.) Two days later, on February 9, 2023, Plaintiff wrote a grievance against Pelkey. The next day, Plaintiff wrote another grievance against Pelkey.

8

At the end of February, Plaintiff spoke to the warden again. He complained about Pelkey's behavior. Warden Burgess informed Plaintiff that the warden was aware of "what's going on and that plaintiff would be good soon . . . ." (*Id.*) A few days later, Plaintiff was told to pack up for transfer out.

Plaintiff notes that when he packed up he required a second state duffle bag to accommodate his excess legal property, thereby confirming his contention that he needed the footlocker in the first instance. Plaintiff reports that the second duffle bag was half full and contained his excess legal property.

Plaintiff reports that he filed three grievances against Pelkey, one on February 8, 2023, one on February 9, 2023, and one on February 10, 2023. Plaintiff claims Pelkey's mistreatment of Plaintiff before the grievances and his transfer after were retaliatory. He seeks a declaratory judgment and damages in the amount of $350,000.

I.   **Failure to State a Claim**

A complaint may be dismissed for failure to state a claim if it fails "to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Id.*; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer

9

possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(ii)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

Plaintiff alleges that Defendant Pelkey retaliated against Plaintiff in violation of his First Amendment rights. Plaintiff alleges also that Defendant Pelkey's conduct constitutes an abuse of authority that violates the Fifth Amendment. Finally, Plaintiff alleges that Defendant Pelkey violated Plaintiff's due process rights under the Fifth and Fourteenth Amendments.[2]

### A.  Retaliation

Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). In order to

---

[2] The Fifth Amendment applies only to claims against federal employees. In this action, Plaintiff sues an employee of the MDOC. Plaintiff, therefore, cannot maintain his Fifth Amendment claims, and those claims will be dismissed. *See, e.g.*, *Scott v. Clay Cnty., Tenn.*, 205 F.3d 867, 873 n.8 (6th Cir. 2000) (noting that "[t]he Fourteenth Amendment's Due Process Clause restricts the activities of the states and their instrumentalities; whereas the Fifth Amendment's Due Process Clause circumscribes only the actions of the federal government").

set forth a First Amendment retaliation claim, a plaintiff must establish three elements: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *Id.*

The filing of a prison grievance is constitutionally protected conduct for which a prisoner cannot be subjected to retaliation. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001); *Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000). The grievance need not be formal to be protected. An inmate has a right to file "non-frivolous" grievances against prison officials on his own behalf, whether written or oral. *Maben v. Thelen*, 887 F.3d 252, 265 (6th Cir. 2018) *see also Pasley v. Conerly*, 345 F. App'x 981, 984–85 (6th Cir. 2009) (finding that a prisoner engaged in protected conduct by *threatening* to file a grievance). "Nothing in the First Amendment itself suggests that the right to petition for redress of grievances only attaches when the petitioning takes a specific form." *Holzemer v. City of Memphis*, 621 F.3d 512, 521 (6th Cir. 2010) (quoting *Pearson*, 471 F.3d at 741) (finding that a conversation constituted protected petitioning activity).

To establish the second element of a retaliation claim, a prisoner-plaintiff must show adverse action by a prison official sufficient to deter a person of ordinary firmness from exercising his constitutional rights. *Thaddeus-X*, 175 F.3d at 396. The adverseness inquiry is an objective one and does not depend on how a particular plaintiff reacted. The relevant question is whether the defendants' conduct is "*capable* of deterring a person of ordinary firmness"; the plaintiff need not show actual deterrence. *Bell v. Johnson*, 308 F.3d 594, 606 (6th Cir. 2002) (emphasis in original).

Although Plaintiff has by no means established his retaliation claim, he has alleged facts supporting the inferences that he engaged in protected conduct, that Defendant Pelkey took adverse

11

action against Plaintiff, and that Pelkey was motivated by a retaliatory intent. Accordingly, the Court will not dismiss Plaintiff's First Amendment retaliation claim on preliminary review.

### B. Due Process

Plaintiff claims that Defendant Pelkey violated Plaintiff's due process rights. Plaintiff does not specify whether it was a violation of Plaintiff's substantive or procedural due process rights. Accordingly, the Court will address both potential claims.

#### 1. Substantive Due Process

The Fourteenth Amendment Due Process Clause prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV. "Substantive due process 'prevents the government from engaging in conduct that shocks the conscience or interferes with rights implicit in the concept of ordered liberty.'" *Prater v. City of Burnside*, 289 F.3d 417, 431 (6th Cir. 2002) (quoting *United States v. Salerno*, 481 U.S. 739, 746 (1987)). "Substantive due process . . . serves the goal of preventing governmental power from being used for purposes of oppression, regardless of the fairness of the procedures used." *Pittman v. Cuyahoga Cnty. Dep't of Child. & Fam. Servs.*, 640 F.3d 716, 728 (6th Cir. 2011) (quoting *Howard v. Grinage*, 82 F.3d 1343, 1349 (6th Cir. 1996)). "Conduct shocks the conscience if it 'violates the decencies of civilized conduct.'" *Range v. Douglas*, 763 F.3d 573, 589 (6th Cir. 2014) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846–47 (1998) (quoting *Rochin v. California*, 342 U.S. 165, 172-73 (1952))). For example, the Sixth Circuit has held that framing an inmate by planting evidence may violate substantive due process where a defendant's conduct shocks the conscience and constitutes an "egregious abuse of governmental power." *Cale v. Johnson*, 861 F.2d 943, 950 (6th Cir. 1988), *overruled in other part by Thaddeus-X*, 175 F.3d at 388; *see also Davis v. Gallagher*, No. 1:16-cv-1405, 2016 WL 7403941, *4 (W.D. Mich. Dec. 22, 2016); *Robinson v. Schertz*, No. 2:07-cv-78, 2007 WL 4454293 (W.D. Mich. Dec. 14, 2007).

12

Plaintiff describes Defendant Pelkey's conduct as an "abuse of authority" (Compl., ECF No. 1, PageID.1, 7, 10, and 11), which implicates the protection afforded by substantive due process. He fails to state a claim, however, because, no matter how obnoxious Defendant Pelkey's reaction to Plaintiff's misguided insistence may have been, the end result was only that Plaintiff was deprived of a footlocker to house his excess legal property. There is no allegation that Plaintiff was denied access to any of his legal property or deprived of any of his legal property, that any of Plaintiff's legal property was damaged, or that Defendant Pelkey put Plaintiff in any position other than the position he was in when he arrived at the facility. The facts alleged, accepted as true, simply do not "shock the conscience" or implicate the very concept of ordered liberty. Accordingly, the Court concludes that Plaintiff has failed to state a claim for violation of his substantive due process rights.

### 2. Procedural Due Process

The elements of a procedural due process claim are (1) a life, liberty, or property interest requiring protection under the Due Process Clause, and (2) a deprivation of that interest (3) without adequate process. *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006). "Without a protected liberty or property interest, there can be no federal procedural due process claim." *Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 519 (6th Cir. 2007) (citing *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 579 (1972)).

There was a time when identifying protected interests focused on the mandatory character of the language in corrections department policies—language like "[p]risoners who have allowable excess legal property are required to store the property in footlockers designated for that purpose, which shall be purchased by the prisoner." (ECF No. 1-2, PageID20.) That time has passed. The Sixth Circuit Court of Appeals described the shift in *Bethel v. Jenkins*, 988 F.3d 931 (6th Cir. 2021), as follows:

13

> Before the Supreme Court's decision in *Sandin v. Conner*, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), prison regulations were found to create protected liberty interests when those regulations "used language of an unmistakably mandatory character," such as, for example, "requiring that certain procedures 'shall,' 'will,' or 'must' be employed." *Hewitt v. Helms*, 459 U.S. 460, 471, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). Accordingly, in *Spruytte v. Walters*, we found, based on *Hewitt*, that a Michigan prison regulation created a protected interest to receive any book not deemed to be a security threat because the regulation contained "specific, substantive criteria restrict[ing] officials' discretion." 753 F.2d 498, 507–08 (6th Cir. 1985), abrogation recognized by *Virgili v. Gilbert*, 272 F.3d 391 (6th Cir. 2001). However, in *Sandin*, the Supreme Court explicitly rejected the approach from *Hewitt* and held that liberty interests arising from state prison regulations are "generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 515 U.S. at 484, 115 S.Ct. 2293 (citations omitted).

*Bethel*, 988 F.3d at 942–43 (footnote omitted).[3]

Considering all of the different limits that the courts have considered are not atypical and significant hardships in relation to the ordinary incidents of prison life, being deprived of permission to purchase a footlocker to store excess legal property certainly falls short as well. *See, e.g.*, *Sandin*, 515 U.S. at 485–86 (holding that the restrictions imposed during 30 days in segregation were not atypical and significant hardships); *Harbin-Bey v. Rutter*, 420 F.3d 571, 577

---

[3] The *Bethel* court noted that, perhaps, a property interest might be treated differently than a liberty interest and that the court had "not yet determined whether *Sandin* applies to property interests . . . ." *Bethel*, 988 F.3d at 943. In *Bethel*, and the other cases cited therein regarding that proposition, prisoners were denied items that they had ordered and that had been delivered to the prison. The cases involved specific property in which the prisoner had some interest. In this case, Plaintiff was not denied a specific footlocker; he was denied authorization to order a footlocker. In *Pickelhaupt v. Jackson*, 364 F. App'x 221, 224–26 (6th Cir. 2010), the Sixth Circuit described the circuit split on the issue and the reasons for distinguishing between a liberty and property interest when considering whether *Sandin* applies. After reviewing *Bethel* and *Pickelhaupt* and the various cases cited therein, the Court concludes that Plaintiff certainly had no property interest in a footlocker that state law would recognize. Accordingly, the Court concludes that the interest at issue here is a liberty interest rather than a property interest. Nonetheless, the Court also considers below whether Plaintiff has stated a claim regarding the deprivation of a property interest in a footlocker.

(6th Cir. 2002) (holding that the restrictions that follow designation as a security threat group member do not represent atypical and significant hardships). Accordingly, the Court concludes that Plaintiff has failed to state a claim for deprivation of a liberty interest without due process.

To the extent it can be said that Plaintiff had some property interest in a footlocker of which Defendant Pelkey deprived Plaintiff, his claim would be barred by the doctrine of *Parratt v. Taylor*, 451 U.S. 527 (1981), *overruled in part by Daniels v. Williams*, 474 U.S. 327 (1986). Under *Parratt*, a person deprived of property by a "random and unauthorized act" of a state employee has no federal due process claim unless the state fails to afford an adequate post-deprivation remedy. If an adequate post-deprivation remedy exists, the deprivation, although real, is not "without due process of law." *Parratt*, 451 U.S. at 537. This rule applies to both negligent and intentional deprivations of property, as long as the deprivation was not done pursuant to an established state procedure. *See Hudson v. Palmer*, 468 U.S. 517, 530–36 (1984). Because Plaintiff's claim is premised upon allegedly unauthorized acts of a state official, he must plead and prove the inadequacy of state post-deprivation remedies. *See Copeland v. Machulis*, 57 F.3d 476, 479–80 (6th Cir. 1995); *Gibbs v. Hopkins*, 10 F.3d 373, 378 (6th Cir. 1993). Under settled Sixth Circuit authority, a prisoner's failure to sustain this burden requires dismissal of his § 1983 due-process action. *See Brooks v. Dutton*, 751 F.2d 197 (6th Cir. 1985).

Plaintiff has not sustained his burden in this case. Plaintiff has not alleged that state post-deprivation remedies are inadequate. Michigan law authorizes actions in the Court of Claims asserting tort or contract claims "against the state or any of its departments or officers." Mich. Comp. Laws § 600.6419(1)(a). The Sixth Circuit specifically has held that Michigan provides adequate post-deprivation remedies for deprivation of property. *See Copeland*, 57 F.3d at 480. Plaintiff does not allege any reason why a state court action would not afford him complete relief

15

for the deprivation, either negligent or intentional, of his alleged property interest in the footlocker. Accordingly, any claim that Plaintiff was deprived of his property interest in a footlocker would be properly dismissed under *Parratt*.

### C. Official or Personal Capacity

Plaintiff sues ECF Resident Unit Manager Unknown Pelkey in his official and personal capacities. (Compl., ECF No. 1, PageID.2.) A suit against an individual in his official capacity is equivalent to a suit brought against the governmental entity: in this case, the Michigan Department of Corrections. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994). An official-capacity defendant is absolutely immune from monetary damages. *Will*, 491 U.S. at 71; *Turker v. Ohio Dep't of Rehab. & Corr.*, 157 F.3d 453, 456 (6th Cir. 1998); *Wells v. Brown*, 891 F.2d 591, 592–93 (6th Cir. 1989). Therefore, the Court also dismisses Plaintiff's First Amendment retaliation claims for monetary relief against Defendant Pelkey in his official capacity.

An official-capacity action seeking injunctive relief constitutes an exception to sovereign immunity. *See Ex Parte Young*, 209 U.S. 123, 159–60 (1908) (Eleventh Amendment immunity does not bar prospective injunctive relief against a state official). However, as the Supreme Court has recognized, a suit under *Ex Parte Young* for prospective injunctive relief is not treated as an action against the state. *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985). Instead, the doctrine is a fiction recognizing that unconstitutional acts cannot have been authorized by the state and therefore cannot be considered done under the state's authority. *Id.* Importantly, "*Ex parte Young* can only be used to avoid a state's sovereign immunity when a 'complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Ladd v. Marchbanks*, 971 F.3d 574, 581 (6th Cir. 2020) (quoting *Verizon Md. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)).

Plaintiff is not seeking injunctive relief, prospective or otherwise. Moreover, he would not be entitled to such relief. The Sixth Circuit has held that transfer to another prison facility moots prisoner injunctive and declaratory claims. *Kensu v. Haigh*, 87 F.3d 172, 175 (6th Cir. 1996); *Mowatt v. Brown*, No. 89-1955, 1990 WL 59896 (6th Cir. May 9, 1990); *Tate v. Brown*, No. 89-1944, 1990 WL 58403 (6th Cir. May 3, 1990); *Howard v. Heffron*, No. 89-1195, 1989 WL 107732 (6th Cir. Sept. 20, 1989); *Williams v. Ellington*, 936 F.2d 881 (6th Cir. 1991). These Sixth Circuit opinions contain only brief explanations of the reasoning supporting this rule. Underlying the rule is the premise that injunctive relief is appropriate only where plaintiff can show a reasonable expectation or demonstrated probability that he is in immediate danger of sustaining direct future injury as the *result* of the challenged official conduct. *Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983). Past exposure to an isolated incident of illegal conduct does not, by itself, sufficiently prove that the plaintiff will be subjected to the illegal conduct again. *See, e.g., Lyons*, 461 U.S. at 102; *Alvarez v. City of Chicago*, 649 F. Supp. 43 (N.D. Ill. 1986); *Bruscino v. Carlson*, 654 F. Supp. 609, 614, 618 (S.D. Ill. 1987), *aff'd*, 854 F.2d 162 (7th Cir. 1988); *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974). A court should assume that, absent an official policy or practice urging unconstitutional behavior, individual government officials will act constitutionally. *Lyons*, 461 U.S. at 102; *O'Shea*, 414 U.S. at 495-96.

Plaintiff seeks declaratory relief. A declaratory judgment claim might, under the right circumstances, fall within the *Ex parte Young* exception to official capacity liability—but "only to the extent it seeks prospective relief." *Ward v. City of Norwalk*, 640 F. App'x 462, 468 (6th Cir. 2016); *see also Cotton v. Mansour*, 863 F.2d 1241, 1249 (6th Cir. 1988) (noting that "*the issuance of a declaratory judgment in these circumstances would have much the same effect as a full-fledged award of damages or restitution by the federal court, the later kinds of relief being of course*

*prohibited by the Eleventh Amendment.*" (emphasis in original)); *Tigrett v. Cooper*, 855 F. Supp. 2d 733, 744 (W.D. Tenn. 2012) (stating that "[d]eclaratory relief is not prospective as required by the *Ex Parte Young* doctrine when it would serve to declare only past actions in violation of federal law: retroactive declaratory relief cannot be properly characterized as prospective.").

The declaration that Plaintiff seeks is that Defendant Pelkey's past actions were wrongful. (Compl., ECF No. 1, PageID.13.) Because that request for declaratory relief is not prospective, Plaintiff's claims seeking such relief against Pelkey in his official capacity are properly dismissed.

## Conclusion

The Court will enter an order lifting the mediation stay and authorizing collection of the filing fee. Having conducted the review required by the Prison Litigation Reform Act, the Court will dismiss Plaintiff's claims under the Fifth and Fourteenth Amendments for failure to state a claim, under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). The Court will also dismiss Plaintiff's official capacity claims against Defendant Pelkey. Plaintiff's claims against Defendant Pelkey in his personal capacity for violation of Plaintiff's First Amendment rights remain. Accordingly, the Court will order service of the complaint upon Defendant Pelkey.


Dated:   November 29, 2023                    /s/ Robert J. Jonker
                                              Robert J. Jonker
                                              United States District Judge